Filed 8/28/24 Northcoast Environmental Center v. County of Humboldt CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| NORTHCOAST ENVIRONMENTAL CENTER et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF HUMBOLDT et al., <br><br> Defendants and Respondents, <br><br><br> ROLLING MEADOW RANCH, LLC, et al., <br><br> Real Parties in Interest and Respondents. | A167278 <br><br> (Humboldt County <br> Super. Ct. No. CV2100518) |

Northcoast Environmental Center, Redwood Region Audubon Society, Citizens for a Sustainable Humboldt, and Mary Gaterud (collectively plaintiffs) appeal a trial court judgment denying their petition for writ of mandate alleging violations of the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[1] and Planning and Zoning Law (Gov. Code, § 65000 et seq.). Plaintiffs seek to overturn the decision of

---

[1] Further undesignated statutory references are to the Public Resources Code.

1

defendants County of Humboldt and its board of supervisors (collectively County) to adopt a mitigated negative declaration and approve conditional use permits allowing Rolling Meadow Ranch, LLC and Rolling Meadow Ranch, Inc. (collectively Rolling Meadow) to operate a cannabis cultivation and processing project (project).  Plaintiffs contend that the County should have required preparation of an environmental impact report (EIR) and that the project is inconsistent with the Humboldt County General Plan (General Plan) and the County's State Responsibility Area Fire Safe Regulations (Humboldt County Code, § 3111-1 et seq.)[2] (SRA Regulations).  We disagree and affirm.

## I.  BACKGROUND

Rolling Meadow proposes to develop a cannabis cultivation and processing operation on 8.5 acres of its 7,110-acre ranch.  The ranch—historically used for ranching and timber operations—is located on the Eel River and is comprised of agricultural and timber land.  The project will include 16 greenhouses—divided among four separate areas—and five processing buildings.  The project will be attended by a maximum of 30 employees each day.

Rolling Meadow first applied for conditional use permits in 2016.  The first initial study was prepared in 2017 and, following multiple rounds of feedback from the County and project revisions by Rolling Meadow, the County circulated for public review and comment a July 2020 initial study and draft mitigated negative declaration.  Rolling Meadow thereafter revised the project based on comments received.  Rolling Meadow submitted a revised

---

[2] Further references to County Code are to the Humboldt County Code.

initial study and mitigated negative declaration (MND) in November 2020.[3] The County provided notice of its intent to adopt the MND and circulated it for a 30-day public review and comment period. After the review period closed, the County's planning commission (Planning Commission) held a public hearing on the project. The Planning Commission adopted the MND, found that the project complied with the General Plan and Zoning Ordinance, and approved the conditional use permits. Three individuals (administrative appellants) appealed the Planning Commission's decision.[4]

After holding a public hearing on the appeal, the board of supervisors (the Board) adopted CEQA findings, including finding that a mitigated negative declaration was appropriate because there was substantial evidence that the project may have a significant effect on the environment, but project revisions would avoid or mitigate the effects, and that certain other impacts—including hydrology and water quality, utilities, and wildfire—were less than significant and did not require mitigation. The Board also found the project conformed to the General Plan. The Board adopted the findings set forth in its resolution, adopted the MND, denied the appeal, approved the six conditional use permits, adopted conditions of approval, and adopted a mitigation monitoring and report program.

In July 2021, plaintiffs filed the operative first amended petition for writ of mandate (petition), which alleged causes of action for violations of

---

[3] While the document was titled "initial study and environmental checklist," the County clarified that it was an initial study and mitigated negative declaration. (Boldface, italics, and capitalization omitted.) Further reference to "MND" refers to the initial study and mitigated negative declaration.

[4] The administrative appellants are not plaintiffs in this lawsuit.

3

CEQA and the Planning and Zoning Law.[5]  After briefing and oral argument, the trial court denied the petition.  In a written order, the court determined plaintiffs had not met their burden of showing there was substantial evidence of a fair argument that the project may have a significant effect on the environment, and it rejected plaintiffs' arguments related to consistency with the General Plan.

## II. DISCUSSION

### A. *CEQA*

Plaintiffs contend the project has not been properly analyzed for significant environmental effects related to its reliance on on-site wells for water, the unstudied use of lignin oil for dust suppression, power infrastructure, and wildfire risks.  They argue that the County should have required preparation of an EIR.

### 1. CEQA Principles and Standard of Review

"CEQA reflects the California state policy that 'the long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian, shall be the guiding criterion in public decisions.'  (§ 21001, subd. (d).)  '[T]o implement this policy,' CEQA and the Guidelines[6] 'have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations.'  [Citation.]  A public agency must 'conduct a preliminary

_____

[5] Plaintiffs alleged a fifth cause of action for declaratory relief, which they subsequently dismissed.

[6] All references to "Guideline" or "Guidelines" are to the Guidelines codified in the California Code of Regulations, title 14, section 15000 et seq. They are guidelines for the implementation of CEQA, developed by the Governor's Office of Planning and Research and adopted by the Secretary of the Resources Agency.  (§ 21083.)

4

review in order to determine whether CEQA applies to a proposed activity.' [Citation.] At this stage, the agency must determine whether any of CEQA's statutory exemptions apply. [Citation.] If the project is in an exempt category for which there is no exception, ' "no further environmental review is necessary." ' [Citations.]

"If the project is not exempt from CEQA, the next step is to conduct an initial study. [Citation.] The initial study determines whether there is ' "substantial evidence that the project may have a significant effect on the environment." ' [Citation.] If there is no such evidence, ' "CEQA excuses the preparation of an EIR and allows the use of a negative declaration . . . ." ' [Citation.] If there is such evidence, ' "but revisions in the project plans 'would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur' and there is no substantial evidence that the project as revised may have a significant effect on the environment, [an MND] may be used." ' [Citation.]

"If neither type of negative declaration is appropriate, the final step is to prepare an EIR. [Citation.] Given that 'the EIR is the "heart of CEQA," ' doubts about whether an EIR is required are resolved in favor of preparing one. [Citations.] [¶] . . . [¶]

"The lead agency must prepare an EIR 'whenever substantial evidence supports a fair argument that a proposed project "may have a significant effect on the environment." ' [Citation.] 'The fair argument standard is a "low threshold" test for requiring the preparation of an EIR.' [Citation.] '[F]acts, reasonable assumptions predicated upon facts, and expert opinion supported by facts' all constitute '[s]ubstantial evidence' of a significant effect on the environment, and '[a]rgument, speculation, unsubstantiated opinion or narrative, or evidence that is clearly inaccurate or erroneous, or evidence that

5

is not credible' do not." (*Parker Shattuck Neighbors v. Berkeley City Council* (2013) 222 Cal.App.4th 768, 776–777 (*Parker Shattuck*).) " ' " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." ' " (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 927.) "As long as there is substantial evidence of a potential significant environmental effect, 'contrary evidence is not adequate to support a decision to dispense with an EIR.' " (*Parker Shattuck*, at p. 777.)

The standard of review in a CEQA case is prejudicial abuse of discretion, which is established if the agency has not proceeded in a manner required by law, or the determination is not supported by substantial evidence. (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 171.) The "appellate court's review 'is the same as the trial court's: [It] reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.' " (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495.)

When reviewing an agency's determination to adopt a mitigated negative declaration, and thus dispose of an EIR, "we must determine whether the record contains substantial evidence supporting a 'fair argument' that the project[] will have a significant impact on the environment." (*McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 87.) " ' "[T]he sufficiency of the evidence to support a fair argument" ' is a question of law. [Citation.] When determining whether sufficient evidence exists to support a fair argument, 'deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no

credible evidence to the contrary.' " (*Parker Shattuck*, *supra*, 222 Cal.App.4th at pp. 777–778.)

Plaintiffs have "the burden of proof 'to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact.' [Citation.] 'Unless the administrative record contains this evidence, and [plaintiffs] cite[ ] to it, no "fair argument" that an EIR is necessary can be made.' " (*Parker Shattuck*, *supra*, 222 Cal.App.4th at p. 778.) If plaintiffs demonstrate that substantial evidence of an unmitigated impact exists, then we must conclude the County abused its discretion by not preparing an EIR. (*McCann v. City of San Diego*, *supra*, 70 Cal.App.5th at p. 87.)

"Reviewing courts also examine whether the agency's decision to adopt a negative declaration is based on a factual analysis of the project's potential impacts." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2024) § 6.75.) "The agency's decision can be invalidated if it appears the agency did not actually evaluate the question whether significant effects might result." (*Ibid*.) When the agency has failed to study a potential environmental impact, "a fair argument may be based on the limited facts in the record. Deficiencies in the record may actually enlarge the scope of fair argument by lending a logical plausibility to a wider range of inferences." (*Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 311 (*Sundstrom*).) While an " 'agency [will] not be allowed to hide behind its own failure to gather relevant data,' " the ultimate issue is "the validity of the lead agency's adoption of a negative declaration." (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1378–1379 (*Gentry*).) It " 'remains the appellant's burden to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of

7

significant environmental impact.' [Citation.] 'An absence of evidence in the record on a particular issue does not automatically invalidate a negative declaration. "The lack of study is hardly evidence that there *will* be a significant impact." ' " (*Id*. at p. 1379.)

## 2. **Hydrology and Water Quality**

Plaintiffs contend the project has not been properly analyzed for significant environmental impacts related to hydrology/water quality. They argue that the County failed to proceed in a manner required by law, and that there is a fair argument that the project's water demands may have a significant effect on the environment.

The project is located on the bank of the Eel River and there are multiple streams within the project vicinity. The MND explained that all "water used in cultivation, processing, and employee needs will be sourced on-site from wells." In June 2019, Rolling Meadow had three wells drilled and tested for yield. The MND concluded that based on the project's water needs, the wells would provide "more than sufficient water supply" for the project. In addition to the wells, the project will collect storm water, which will be used for landscaping, fire protection, and supplemental water for dust mitigation. In going through the checklist[7] for hydrology and water quality impacts, the MND concluded the project would not substantially decrease groundwater supplies or interfere substantially with groundwater recharge. The MND explained the wells are not hydrologically connected to any surface

_____

[7] "The checklist promulgated in the Guidelines asks the lead agency to characterize each factor as potentially significant, less than significant with mitigation incorporated, less than significant, or having no impact. (Guidelines, appen. G.)" (*Ocean Street Extension Neighborhood Assn. v. City of Santa Cruz* (2021) 73 Cal.App.5th 985, 1005 (*Ocean Street*).)

8

water or any part of a larger shallow homogeneous aquifer.  The wells do not draw from a contiguous shallow aquifer as they are spread over miles of hilly terrain at different elevations.

### a. Inconsistency in Documentation Regarding Wells

Plaintiffs contend the County failed to proceed in the manner required by law because its conclusions that there are no substantial impacts related to hydrology or water quality were based on conclusions which relied on contradictory facts.  The well completion reports submitted by the well driller, David Fisch, located one of the wells on one parcel, 140 feet from Beatty Creek, while other maps included in the MND located that well on a different parcel, farther away from a watercourse.  Based on this, plaintiffs argue the conclusions are unsupported and the analysis incomplete.[8]

The County and Rolling Meadow argue plaintiffs may not raise this argument based on failure to exhaust administrative remedies and forfeiture for not raising this issue before the trial court.[9]  We reject their claim of failure to exhaust.  As plaintiffs demonstrate, a letter from Pacific Watershed Associates (PWA)—retained by the administrative appellants—raised this issue during the administrative process and fairly apprised the County of the concern.  (See *Save the Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 677 (*Agoura*); *Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1104–1105.)

---

[8] The purposes of an initial study include to provide documentation of the factual basis for the finding in a negative declaration that a project will not have a significant effect on the environment.  (Guidelines, § 15063, subd. (c)(5).)

[9] The County and Rolling Meadow filed a joint opposition brief.

We agree, however, with the County and Rolling Meadow's contention that plaintiffs forfeited this argument by raising it for the first time on appeal. (See *Ocean Street*, *supra*, 73 Cal.App.5th at pp. 1008–1009 [plaintiff forfeited argument by failing to raise it in the trial court].) Plaintiffs did not argue this issue about well location in their trial court briefing on the merits of the petition. Plaintiffs do not point to their trial court briefs or oral argument. Instead, they only point to the petition itself. In their petition, they alleged the project description was legally inadequate because it failed to accurately and consistently describe and define project characteristics in sufficient detail to enable impact analysis. They alleged the water supply analysis was inadequate because it presented conflicting information regarding groundwater use and the use of captured rainwater, undermining its ability to accurately disclose, analyze, or mitigate water supply impacts. They alleged there was not proper analysis of the hydrologic connectivity between the well groundwater and surface waters, but plaintiffs point to nothing in their petition that addresses the argument they now make. In any event, even if it had been alleged in the petition, it was not raised to the trial court on the merits. Plaintiffs cite no authority that asserting an allegation in a petition is the equivalent of raising that issue to the trial court in deciding the merits. Therefore, we will not address this argument.

b. *Reasonably Foreseeable Future Activities*

Plaintiffs contend the County failed to proceed in the manner required by law because it did not analyze reasonably foreseeable groundwater

10

impacts.[10]  They contend it is reasonably foreseeable that the wells will be insufficient to supply project water needs, but the MND did not address this.

In 2019, Fisch drilled the three on-site wells.  In June 2019, he measured the water levels and yields of the wells based on a four-hour test.  For each well he provided the estimated yield, remarking that it "[m]ay not be representative of a well's long term yield."  The project will use approximately 4,628,200 gallons of water annually for year-round operations (12,680 gallons per day).  Relying on the well yield tests, the MND stated, "Assuming year-round flow rates as tested, the project could produce a combined average of 63 gpm [gallons per minute]; 63 gpm would result in 90,720 gallons in 24[ hours] and a more than sufficient water supply for the projected project needs."

Plaintiffs contend that this assumption of year-round flow rates as tested by Fisch was impermissible speculative analysis, relying on *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412 (*Vineyard*).  There, in addressing whether an EIR provided adequate information for the long-term provision of water to a development project, the Supreme Court explained that "CEQA's informational purposes are not satisfied by an EIR that simply ignores or assumes a solution to the problem of supplying water to a proposed land use project."  (*Id*. at pp. 430–431.)  The "future water supplies identified and analyzed must bear a likelihood of actually proving available; speculative sources and unrealistic allocations ('paper water') are insufficient bases for decisionmaking under CEQA."  (*Id*. at p. 432.)  The "EIR's discussion must include a reasoned

---

[10] Preparing a negative declaration "involves some degree of forecasting.  While foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can."  (Guidelines, § 15144.)

11

analysis of the circumstances affecting the likelihood of the water's availability." (*Ibid.*)

Unlike in *Vineyard*—which involved a challenge to an EIR, not an initial study and negative declaration[11]—here the record demonstrates that the conclusion about water supply is not speculative. In its report to the Planning Commission, in response to concerns regarding well production tests not being performed during the dry season, staff replied that it did not preclude well production information from being utilized for review. Staff explained that the wells tested at a combined total of 63 gallons per minute which, if operated at that level, would provide all the water needed for the project in 51 days. If the wells were only operated for 12 hours a day and yielded half the tested flow, the total water demand could still be provided in 204 days. Staff concluded there "is not a doubt that there is sufficient water to accommodate this use." Plaintiffs do not point to any record evidence that it is reasonably foreseeable that the wells will be unable to supply the project's water needs. (See *Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 712 (*Rominger*) [plaintiffs did not point to any evidence in the record that certain uses were a reasonably foreseeable consequence of the project].)

Plaintiffs next take issue with the conditions of approval regarding water use. Staff stated, "Conditions of approval require the applicant to meter water use to demonstrate that the well meets the water demand and provide evidence of metering at the time of annual inspection. Should the wells not provide sufficient water for the operation, the applicant is required

---

[11] "An initial study is only a 'preliminary analysis' [citation] and the regulatory requirements regarding its contents are not as demanding as those imposed upon an EIR." (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1192.)

12

to modify this permit and propose a different non-divisionary [*sic*] source of water, such as rain catchment and/or reduce the size of the cultivation area to be consistent with water availability. As conditioned, the project therefore conforms to the performance standards for water."

Plaintiffs contend this language was not actually adopted as a condition of approval, and they argue that the conditions which were adopted do not require Rolling Meadow to modify the permit should there be insufficient water. The County and Rolling Meadow argue plaintiffs forfeited this argument because they did not raise it to the trial court, and that plaintiffs waived this argument by not citing to legal authority or the record. We agree with the County and Rolling Meadow. Plaintiffs cite only one page of their trial brief, where they argued that the MND assumed sufficient groundwater for the project in perpetuity, which was an inadequate analysis. Plaintiffs urged that the analysis should have identified alternative sources of water and analyzed the environmental impacts caused by using those sources. What plaintiffs do not show, however, is that they made an argument to the trial court which they make here—arguing that language in the staff reports was not included in the adopted conditions of approval and challenging the approved conditions. (See *Ocean Street*, *supra*, 73 Cal.App.5th at pp. 1008–1009.) Additionally, in challenging the conditions of approval, plaintiffs do not cite the record or legal authority,[12] and the heading for this section in

---

[12] We observe that throughout the discussion section of their opening brief, plaintiffs cite little legal authority or, more frequently, none. They merely provide "*supra*" references to a previous section on the standards of review. "We are not required to develop appellants' arguments for them. [Citation.] 'We may and do "disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt." ' " (*Los*

their opening brief, titled "[the County and Rolling Meadow] did not address the reasonably foreseeable insufficiency of wells to supply project needs," does not mention conditions. (Capitalization and boldface omitted.) We conclude plaintiffs have forfeited and waived any challenge to the conditions of approval. (See *Los Angeles Unified*, *supra*, 57 Cal.App.5th at pp. 497–498 [plaintiffs must provide cogent argument supported by legal analysis and citation to the record]; *Tsakopoulos Investments, LLC v. County of Sacramento* (2023) 95 Cal.App.5th 280, 310 [" 'Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading.' "].)

Finally, to the extent plaintiffs argue the County improperly deferred the issue of water supply for future analysis, we are not persuaded. This argument is not fully developed by plaintiffs. (See *Los Angeles Unified*, *supra*, 57 Cal.App.5th at pp. 497–498 [we are not required to develop plaintiffs' arguments for them].) Plaintiffs again rely on *Vineyard*, *supra*, 40 Cal.4th at page 431, where the Supreme Court stated, "[T]he future water sources for a large land use project and the impacts of exploiting those sources are not the type of information that can be deferred for future analysis." Here, there is no demonstration that the County deferred analysis. Sufficient long term water supply did not need to be demonstrated "with certainty"; it just needed to "show a *likelihood* water would be available, over the long term, for this project." (*Id.* at p. 441.)

---

*Angeles Unified School District v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 497–498 (*Los Angeles Unified*); see also *Cinema West, LLC v. Baker* (2017)13 Cal.App.5th 194, 219 (*Cinema West*) [" 'appellant must present argument and authorities on each point to which error is asserted, or else the issue is waived' "]; *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 (*Hernandez*) [an issue raised but unsupported with reasoned argument, citations to authority, and record citations is waived].)

14

*c. Fair Argument of Significant Effect on the Environment*

Plaintiffs contend substantial evidence exists to support a fair argument that the project's water demands may have a significant effect on hydrology or water quality. We disagree.

The MND assessed potential hydrology and water quality impacts by going through the checklist and it found each impact was less than significant or nonexistent. It concluded, among other things, that the project would not substantially decrease groundwater supplies or interfere substantially with groundwater recharge. The MND also concluded the project would have sufficient water supplies to serve the project, including during dry years.[13]

The MND explained the project will use approximately 4,628,200 gallons of water per year, with daily water use of 12,680 gallons. In testing, the three wells yielded 13 gallons per minute, 20 gallons per minute, and 30 gallons per minute. As explained above, the MND concluded the wells would provide a more than sufficient supply of water for the project's needs. Additionally, storm water will be collected and stored near each greenhouse.

In commenting on the MND regarding well productivity, PWA challenged the well yield tests being conducted in June instead of during the dry season of August through September. County staff replied that this did not preclude the well production information from being utilized for review. Staff explained that the wells tested at a combined total of 63 gallons per minute which, if operated at that level, would provide all the water needed for the project in 51 days. If the wells were only operated for 12 hours a day and at half the tested yield, the total water demand could still be provided in

---

[13] This conclusion was part of the assessment of utilities and service systems impacts.

15

204 days.  Staff replied there "is not a doubt that there is sufficient water to accommodate this use."

Regarding hydrologic connectivity, the MND cited to Fisch, the well driller, who had stated, " 'The wells were completed in the Franciscan Sandstone.  The wells are drilled into perched bedrock with no hydraulic connection to any surface water or any part of a larger shallow homogeneous aquifer.  Considering the depth of the well, it appears to fall in line with the guidelines of a non-jurisdictional well of similar depth in the surrounding area.' "  The MND explained that the project wells do not draw from a contiguous shallow aquifer as they are spread over miles of hilly terrain at different elevations.

A staff report to the Planning Commission explained that an examination of Fisch's well logs indicated that the depth and screening intervals are such that "the wells are not connected to any surface water features, and as such do not require water rights for diversion and use."  Staff responded to public comments received on the MND.  Staff explained that the Department of Fish and Wildlife (CDFW) had raised concerns that the wells may be hydrologically connected to surface water, and, by extension, the large amount of proposed water use could have an adverse impact on aquatic resources.  Staff responded that the wells are deep groundwater wells that have screening intervals which strongly indicate they are not connected to the underflow of any surface water features, which indicates no direct impacts to aquatic resources.  "This analysis was performed by staff and is also supported by the opinion of the well driller, Dave Fisch, who has extensive expertise of installing and working with wells in" the County.

In reply to the administrative appellants' claim that the depth at which the wells were drawing water indicated they were connected to surface water

16

features, staff replied that their conclusory statement was not supported by factual data to support their contention. Instead, the depth and location of the wells relative to surface water features indicated they were not hydrologically connected to surface water features.

The conditions of approval imposed by the County require Rolling Meadow to "install and utilize a water meter to demonstrate that there is sufficient water supply to meet the demands of the project. The water use for cultivation is limited to the use of the well and amount of water available in storage tanks and shall be provided annually prior to or during the annual inspection."

Plaintiffs rely on the following evidence to contend there is a fair argument the project may have a significant environmental impact.

CDFW commented on the use of the wells, explaining that the "scientific and engineering community universally accepts the connectivity of surface water and groundwater systems and that groundwater discharge to streams constitutes a sizeable and important fraction of streamflow." CDFW commented that the MND had relied on Fisch, a well contractor. It stated, "In light of the Project's geologic setting, mapped springs, wetlands, and other surface water features . . . , and based on the potential total volume of groundwater extraction from the three new wells, CDFW recommends the applicant retain a qualified professional (e.g. geologist or engineer with hydrogeology background)" to evaluate the potential impacts to local surface water flows and provide recommendations that ensure the project will not substantially affect aquatic resources.

PWA submitted a letter written by geologists discussing the hydrologic connectivity of the wells. It discussed the locations of the three wells, including its observation that well 1 is 140 feet from a tributary stream to

17

Beatty Creek, and wells 2 and 3 were 300 feet and 400 feet from a wetland habitat. PWA stated that significant pumping of groundwater from the wells "could have potential adverse impacts to the watershed from reduced groundwater storage and/or a lowering of the local water table." When groundwater levels are reduced, the location where groundwater intersects with the land surface can lower, causing springs and seeps to dry up. PWA remarked that geologic investigations to quantify the hydraulic properties of aquifers at the site had not been conducted. Due to the proximity of the wells to surface waters, PWA remarked that the cone of depression from continuous well water withdrawal may intersect and affect nearby stream and wetland resources. PWA recommended that additional hydrogeologic investigations should be conducted to better identify and describe potentially significant impacts to the wetlands and watercourses.

PWA also discussed the wells' productivity. PWA remarked that pursuant to the County's standards, water production tests must be conducted during the dry season—August through September—and be representative of the lowest annual water production anticipated from the source. Because Fisch conducted testing in June, PWA recommended additional testing be completed. PWA continued, stating that the wells are in the rocks of the Yager terrane. Regarding the four-hour well productivity tests, PWA stated it was "possible that short-term testing of wells in sheared mudstone rocks of the Yager terrane is misrepresentative of sustained well yield," which "may be much lower than is recognized." PWA recommended "more prolonged well pump testing."

PWA's comments do not constitute substantial evidence of a fair argument that the project may have a significant environmental effect. PWA did not opine that the groundwater which will be drawn from the wells is

18

hydrologically connected, or is likely connected, to surface water. PWA discussed the wells' proximity to streams and wetlands habitats, but it did not opine that such proximity means they are connected. In essence, PWA merely recommended additional investigation. Regarding well productivity, PWA's comments again just recommended more testing.

Plaintiffs challenge Fisch's qualifications to opine on hydrologic connectivity. During early review of the project—before the wells were drilled—in advising Rolling Meadow that a prior initial study was deficient, County staff stated that consultation with an engineering geologist was needed to document the groundwater supply. It explained Rolling Meadow needed to demonstrate that the wells were not hydrologically connected to the water flow of the river.

Plaintiffs cite documents referenced in the MND. This includes a Department of Water Resources bulletin regarding the state's groundwater. While focusing on groundwater resources, the Department of Water Resources recognized that, "[I]n reality groundwater and surface water are inextricably linked in the hydrologic cycle. As an example, groundwater may be recharged by spring runoff in streams, but later in the year the base flow of a stream may be provided by groundwater. So, although the land surface is a convenient division for categorizing water resources, it is a somewhat arbitrary one. It is essential that water managers recognize and account for the relationship between groundwater and surface water in their planning and operations." Plaintiffs also point to documents referenced by CDFW in commenting on the MND. A 2012 U.S. Geological Survey publication regarding streamflow depletion by wells noted that a common misconception is that pumping groundwater exclusively below a confining layer will eliminate the possibility of depletion of surface water connected to the

19

overlying groundwater system. These materials do not demonstrate a fair argument of a significant environmental effect because they contain general information and are unrelated to the project area.

In February 2019—before the wells were drilled—Rolling Meadow's president wrote to the County identifying the steps Rolling Meadow had taken to obtain permit approval. He explained Rolling Meadow's proposal that water for the greenhouses would be supplied by wells, and he stated there was an "abundance of water on the property. The head waters of Beatty Creek and Camron [*sic*] Creek are on the property that produce large quantity of water year-round." He stated Fisch had assured they would have an abundance of available water to meet their demands. Once Rolling Meadow obtained approval, they would "drill the wells to guarantee there is adequate water at strata that does not adversely affect the Eel River." The president is not an expert on hydrology and his statements cannot be construed as substantial evidence supporting a fair argument of hydrologic connectivity. A review of his full letter demonstrates his belief that once the wells were drilled it would be shown that the wells would provide sufficient water which did not affect the Eel River. His observations about watercourses on his property do not constitute substantial evidence that those watercourses are connected to the well groundwater.

Finally, plaintiffs assert that the public commented on potentially significant impacts, relying on their personal experience with the Eel River and associated waterways, as well as literature. Plaintiffs just list, without discussing, a long string of record citations. Their "failure to explain the significance of" these public comments "is by itself sufficient to defeat their arguments," because "it is not for us to construct a sufficient argument for them." (*Rominger*, *supra*, 229 Cal.App.4th at p. 729.) In any event, the

20

comments from the public—mainly local residents—do not constitute substantial evidence. The commenters provided their personal experience and observations, including that the area has a dire water situation, with the creeks barely flowing in the summer and the river being bare, so they think it "mind blowing" to take water from the aquifer for the project. They expressed their concerns over the project taking water from the dwindling watersheds. One commenter stated the "wells are absolutely 'connected' to the Eel River," however they provided no support for that contention. One commenter stated that basic concepts of hydrology show that groundwater is the source of many springs and creeks, especially in the dry months, so unlimited groundwater pumping would impact all downstream water users. While area residents may provide their experience and observations regarding drought conditions and the creeks and river being dry during summer, they do not have expertise to opine on whether the groundwater wells are hydrologically connected to surface waters. (See *Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 402 [personal observations on "nontechnical issues" may constitute substantial evidence]; *Newtown Preservation Society v. County of El Dorado* (2021) 65 Cal.App.5th 771, 789 [lay opinion based on technical information which requires expertise does not constitute substantial evidence].)

For the reasons explained above, and taking together plaintiffs' cited evidence, the evidence does not support a fair argument that the project's water demands may have a significant effect on the environment, either related to hydrologic connectivity or well productivity.

The evidence does not support a fair argument that the wells may be hydrologically connected to local surface water, such that use of the wells

21

may have a substantial impact on hydrology or water quality. Plaintiffs' arguments are really an attack on the County's reliance on the information provided by Fisch, including his well logs and explanation that the wells are not hydrologically connected. The cited evidence attacks Fisch's qualifications and recommends further testing. (See *Parker Shattuck*, *supra*, 222 Cal.App.4th at p. 786 ["a suggestion to investigate further is not evidence, much less substantial evidence, of an adverse impact"].) The evidence does not, however, support a fair argument that the project's wells may be hydrologically connected to surface flows and, thus, impact local surface water flows and groundwater supplies. "In other words, the thrust of [plaintiffs'] criticism was apparently to attack the evidentiary basis for the [C]ounty's conclusion that the project would not have a significant impact on groundwater supplies, rather than identifying or providing evidence to support a fair argument to the contrary." (*Rominger*, *supra*, 229 Cal.App.4th at p. 730.)

Nor does the evidence support a fair argument that the wells may not be able to supply the project's water needs. Again, plaintiffs attack the results of Fisch's well yield tests and recommend further testing be conducted during the dry season. But they have failed to cite evidence demonstrating the wells will not, or may not, be sufficiently productive. Even if we assume there is substantial evidence demonstrating that the wells may be less productive than identified in the yield tests, plaintiffs have not demonstrated how that may affect the environment. For example, if the wells cannot supply sufficient water for project operations, there is no evidence that Rolling Meadow would then divert water from a nearby watercourse.

In sum, plaintiffs have not met their burden of demonstrating that substantial evidence supports a fair argument that the project's water demands may have a significant effect on the environment.

### 3. Lignin Oil

Plaintiffs argue the County failed to proceed in the manner required by law because it did not analyze the impacts of the use of lignin oil for dust suppression on biological resources, hydrology/water quality, hazards and hazardous materials, or wildfires. We disagree.

A prior initial study—prepared in 2018—assessed air quality impacts and discussed dust generated during the construction phase of the project and the methods to control it. This included spraying the road with water and it also stated that the dirt roads would be rocked and oiled with lignin sulfonate compound to further reduce airborne particulate. In subsequent correspondence with the County, Rolling Meadow explained that regarding dust being produced on the roads, dust was not reflective of the project operations as the predominant use in the ranch's roads would be by the guard shuttling employees in the electric bus. Rolling Meadow explained the road would "be rocked and, in any event, if any dust was generated, we would have the road sealed with lignin oil. Lignin oil is a chemically derived biodegradable oil that is completely harmless to fish and wildlife." In response, the County remarked that the chemical makeup of lignin oil and the quantity and frequency of use had not been described. The County explained that the initial study's analyses of impacts to air quality, biological resources, and hydrology did not "discuss the effect [of lignin oil] on biological resources, run-off potential and impacts to watercourses." Rolling Meadow subsequently advised the County that it had removed lignin oil from the proposal because it was unnecessary. Rolling Meadow explained that clean

23

gravel, a conservative speed limit, and reduced traffic (bus only and not individual trips) would be adequate for dust control.

Because Rolling Meadow eliminated the use of lignin oil as a dust suppressant, the MND did not address it. In discussing air quality impacts, the MND discussed dust emissions during both the construction of the project and its operation. It concluded any impact was less than significant by complying with the North Coast Unified Air Quality Management District's rule 104. In compliance with rule 104, during construction, the project would use water trucks to spray surfaces to control fugitive dust. Additionally, the roads would be rocked with clean road rock. During project operations, project roads are either rocked or will only be used during the wet season, eliminating the prospect of fugitive dust. Additionally, the project applied U.S. Department of Transportation strategies to mitigate unpaved road dust, including a 15 miles per hour speed limit, limiting the number of vehicles on the road—employees would be transported from the parking area via electric bus—and rocking the ranch roads.

After the Planning Commission approved the project, and before the Board hearing, Rolling Meadow proposed project revisions in response to concerns raised by neighbors. It proposed to have employees park at the park and ride lot near the highway and be shuttled to the ranch to cut down on individual car trips on McCann Road, and "[i]f necessary, the project will periodically treat the dirt portion of McCann Road in front of residences with Lignin Oil or [a] similar product to control dust." In addressing these proposals, County staff stated in their report to the Board that these changes had been added to the proposed findings and conditions of approval, and they would "not cause any new environmental effects."

24

At the Board hearing, counsel for the administrative appellants brought up the reintroduction of lignin oil and remarked that the County had previously advised Rolling Meadow that it had a concern about lignin oil not being properly addressed. In approving the project, the Board adopted conditions of approval which included, as relevant here, a mandate that Rolling Meadow monitor the dirt portion of McCann Road in front of residences and "shall treat the road surface with Lignin Oil or [a] similar product to control dust."

Plaintiffs challenge the County's conclusion that lignin oil poses no potentially significant impact, contending it is unsupported by documentation. Demonstrating that the County approved the project with a condition requiring that Rolling Meadow monitor the dirt portion of McCann Road in front of residences and treat the road "with Lignin Oil or [a] similar product to control dust"—even though lignin oil had not been analyzed in the MND—does not, by itself, demonstrate a prejudicial abuse of discretion. Staff's report to the Board on Rolling Meadow's proposed changes which occurred post-Planning Commission approval was brief. Staff merely reported that the proposed changes, including the use of lignin oil, had been added to the findings and conditions of approval and would "not cause any new environmental effects." While there appears to be no comprehensive analysis, such shortcomings merely relate to the determination of whether there is substantial evidence supporting a fair argument that the project's potential use of lignin oil may have a significant effect on the environment. Plaintiffs cite no authority supporting their proposition that failure to analyze a potential impact and lack of documentation regarding a component of a project constitute a prejudicial abuse of discretion. In fact, in the

sections of their briefs addressing lignin oil, plaintiffs cite no authority at all. (See *Cinema West*, *supra*, 13 Cal.App.5th at p. 219.)

It remains plaintiffs' burden to cite record evidence supporting a fair argument of significant environmental impact. (*Gentry*, *supra*, 36 Cal.App.4th at pp. 1378–1379.) Lack of study does not constitute evidence that there will be a significant impact. (*Id*. at p. 1379.) When a potential environmental impact has not been studied, "a fair argument may be based on the limited facts in the record. Deficiencies in the record may actually enlarge the scope of fair argument by lending a logical plausibility to a wider range of inferences." (*Sundstrom*, *supra*, 202 Cal.App.3d at p. 311.) Plaintiffs make no argument that applying lignin oil on the roads for dust suppression may have a significant environmental impact. As plaintiffs reference, in reviewing a prior initial study, County staff had advised Rolling Meadow that the study had not addressed the chemical makeup of lignin oil, its frequency of use, or the potential for environmental impacts. But these comments do not constitute substantial evidence of a fair argument that lignin oil may have a significant environmental effect. They just called for additional information.

Further, as the County and Rolling Meadow point out, there is evidence in the record regarding lignin. The County's approval was under the provisions of the 2016 Commercial Medical Marijuana Land Use Ordinance (CMMLUO). In enacting the CMMLUO, the County had adopted a mitigated negative declaration, with mitigation measures, finding that all potential impacts associated with implementation of the ordinance had been reduced to a less than significant level. The CMMLUO MND explained that the ordinance's requirements worked "to mitigate both project-specific and cumulative watershed-level impacts through implementation of 'standard

26

conditions' and 'best management practices.' " One of the best management practices for site maintenance and operations stated, "Road surfacing, especially within a segment leading to a watercourse, is critical to prevent and minimize sediment delivery to a watercourse and maintain road integrity for expected uses. Road surfacing can include pavement, chip-seal, *lignin*, rock, or other material appropriate for timing and nature of use." (Italics added.) While a lack of study may enlarge the scope of fair argument, here the record does not permit a reasonable inference that use of lignin oil may have a significant environmental impact. (*Sundstrom, supra*, 202 Cal.App.3d at p. 311.)[14]

### 4. Infrastructure

Plaintiffs contend the project has not been properly analyzed for significant environmental impacts related to power infrastructure. They argue that the County failed to proceed in a manner required by law, and that there is a fair argument that the project's power needs may have a significant effect on the environment.

The MND explained Pacific Gas and Electric Company (PG&E) will supply the project's electricity. There is existing PG&E infrastructure in above-ground poles located on the south side of the property near the Eel River. New electrical lines will be run underground from the existing section to the greenhouses and processing buildings. Power will be supplied by the local utility Redwood Coast Energy Authority (RCEA) Community Choice

---

[14] We note that even if lignin oil were used for dust suppression on the dirt portion of McCann Road in front of residences—as stated in the conditions of approval—such use would be minimal as the predominant use of the road would be by the electric shuttle bus to transport employees from the parking lot to the work site. Thus, there is no demonstration that any potential environmental impacts would rise to any significant levels.

Energy, Repower Plus Program, which allows the project to purchase on-grid power with 100 percent renewable energy resources. The project will have four emergency propane generators and water pumps. The MND stated the generators will be utilized in case of a power failure during a fire. They will only be used to run water pumps for fire suppression, and they "will not be used to power grow lights." To maintain readiness, the generators will run an exercise cycle for five minutes every two weeks, consuming 1.5 gallons of propane a year. If no fires occur, generators will not run apart from the exercise cycle.

The MND concluded the generators would not have potentially significant air quality impacts or noise impacts to wildlife and neighbors. It also concluded the project's energy requirements would have no impact on energy resources, would not conflict with a renewable energy plan, and would not have significant greenhouse gas emissions.

The Board resolution adopting the MND found that the project's power would be provided by PG&E. The conditions of approval require Rolling Meadow to record a development plan approved by the County's planning department (Planning Department) that the electric service developed for the project is only to be used for the cannabis cultivation areas and associated structures that support the cannabis operation. The conditions of approval also require Rolling Meadow to construct noise containment structures for the generators, and the ongoing requirements and development restrictions require that the "noise produced by a generator used on an emergency-only basis for cannabis drying, curing, and processing shall not be audible" by neighbors.

*a. Documentation to Support Findings*

Plaintiffs contend the MND's conclusions of no potentially significant impacts related to air quality, noise, energy, greenhouse gas emissions, and utilities and service systems are based on assumptions that (1) PG&E can provide the necessary infrastructure, (2) RCEA can provide 100 percent renewable energy resources, and (3) generator usage will be limited to exercise cycles and operation of water pumps during fire emergencies. They argue no documentation supports these assumptions and, therefore, the County failed to proceed in the manner required by law.

Specifically, plaintiffs argue that the record does not establish that PG&E can or will install underground power lines and can or will meet the energy requirements for the project, and the conditions of approval do not include a requirement that PG&E provide a " 'will serve' letter" before project operation; the conditions of approval and mitigation monitoring program do not include a requirement that PG&E conduct a site-specific review and create a site-specific construction plan; the conditions of approval and mitigation monitoring program do not include a requirement that RCEA confirm that it can provide 100 percent renewable energy for the project; and the conditions of approval and mitigation monitoring program do not limit generator use for fire suppression purposes during an emergency.

To the extent plaintiffs contend that the County's conclusions of no significant environmental impacts caused by the project's power infrastructure are "unsupported by any evidence," we observe that plaintiffs cite no authority in the sections of their opening brief (section V.C.1.a) or reply brief (section II.E.1) on this topic showing that unsupported conclusions in an initial study and negative declaration constitute a prejudicial abuse of discretion. This is justification to disregard plaintiffs' contention. (See *Los*

*Angeles Unified*, *supra*, 57 Cal.App.5th at pp. 497–498; *Cinema West*, *supra*, 13 Cal.App.5th at p. 219.)  In any event, we are not persuaded by plaintiffs. The findings of no significant impacts as related to the project's power infrastructure are supported by evidence.  The record demonstrates that if PG&E cannot supply power to the site, then the project will not operate. Regarding renewable energy, the MND stated the "project operator has secured a letter from the RCEA that confirms availability for the project's power demand."  And the record shows that Rolling Meadow will not use generators during power outages other than for fire suppression.

To the extent plaintiffs are challenging the conditions of approval or the mitigation monitoring and report program, the County and Rolling Meadow argue, and we agree, that plaintiffs forfeited these arguments by raising them for the first time on appeal.  In the trial court, plaintiffs did not argue, as they do here, that any claimed lack of documentation to support the conclusions was addressed "through reference to mitigation conditions that were not made enforceable."  In their trial court merits briefing, in attempting to demonstrate a fair argument that the project may have significant energy impacts, plaintiffs argued, among other things, that the power extension was unverified despite requests from PG&E and RCEA to verify the infrastructure and service.  And without power, prolonged reliance on generators was likely and would cause various environmental impacts which were not analyzed.  They continued to assert that the adopted findings and conditions did not restrict generator use.  But plaintiffs advanced these arguments to support their contention that there was a fair argument of environmental impacts associated with satisfying the project's energy requirements.  They were not a separate argument challenging the conditions of approval or mitigation monitoring and report program, like here.  This is

clear from plaintiffs' trial brief where they claimed, the "lack of necessary and specifically requested information concerning the Project's energy needs and infrastructure, together with the absence of any conditions restricting generator use, expands the fair argument concerning impacts associated with satisfying the Project's energy requirements." Because plaintiffs did not advance these arguments to the trial court, we will not address them. (See *Ocean Street*, *supra*, 73 Cal.App.5th at pp. 1008–1009.)

Plaintiffs have not demonstrated that the conclusions of no significant environmental effects related to the project's power sources constitute a prejudicial abuse of discretion.

### b. *Reasonably Foreseeable Future Activities*

Plaintiffs argue the County failed to proceed in the manner required by law by not analyzing impacts from reasonably foreseeable future activities. They contend it is reasonably foreseeable that PG&E may not provide the proposed infrastructure, may not provide it before the project is operational, and may not have the capacity to meet the project's needs. They further argue that RCEA may not be able to provide 100 percent renewable energy sources. They also assert it is reasonably foreseeable that generators will be used for purposes beyond emergency fire suppression. Therefore, plaintiffs contend the County was required to, but did not, address the environmental impacts of these circumstances.

We agree with the County and Rolling Meadow that plaintiffs waived this argument. This three-paragraph section in plaintiffs' opening brief (section V.C.1.b) does not cite any legal authority or record evidence. Plaintiffs have failed, therefore, to support their claimed foreseeable circumstances. (See *Hernandez*, *supra*, 37 Cal.App.5th at p. 277 [an issue raised but unsupported with reasoned argument, citations to authority, and

31

record citations is waived]; *Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 926–927 [cursory arguments unsupported by record citations are disregarded].) Therefore, we do not address this issue.

   c. *Fair Argument of Significant Effect on the Environment*

   Plaintiffs contend substantial evidence exists to support a fair argument that the power needs of the project may have a significant effect on the environment. We disagree.

   The MND explained that electricity for the project will be supplied by PG&E through installation of new underground electrical lines run from the existing section of infrastructure. The local utility, RCEA, will supply the project's power through the purchase of 100 percent renewable sources. The MND stated, the "project operator has secured a letter from the RCEA that confirms availability for the project's power demand." The MND stated that, "PG&E will conduct a site-specific review of the project and create a site specific construction plan. The project will comply with PG&E's site-specific safety and installation requirements."

   Staff responded to public comments which questioned PG&E's ability to adequately supply power needs for the project. Staff explained that PG&E was the only authorized power source for the project. "The applicant is required to demonstrate that PG&E is installed as described by the project description prior to use of any power use for the proposed project." At the Board hearing, regarding a "will serve letter" from PG&E, the County's planning director (Planning Director) explained that obtaining such letter is normally done with water and sewer service. He explained that if the applicants could not get PG&E on the site, they are not authorized to run on a generator so, "the site would not be able to operate until PG&E is on-site." Regarding generator use, County staff reiterated that "the [MND] is very

32

clear. The project does not use generators to provide backup power in the case of PG&E outages. The generators are there specifically to support the fire safety mechanisms. They're for no other use. So if the power goes out from PG&E, the project [will be] without power, but the generators are there to support the fire safety equipment. That's the only reason their [*sic*] there, and the [MND] is very clear on that purpose."

The conditions of approval and requirements and restrictions which must be satisfied for the life of the project include a mandate that all components of the project must be developed, operated, and maintained in conformance with the project description, the approved site plan, the plan of operations, and the conditions of approval. The project description in the MND stated, in relevant part, that the electricity would be supplied by PG&E and power would be 100 percent renewable supplied by RCEA. The project description also explained that generators could only be used in case of a power failure during a fire to run water pumps, and during their exercise cycles.

Plaintiffs argue the record contains substantial evidence demonstrating that PG&E will either not be able to provide power to the project or will not be able to meet the needs of the project's operation, which would result in generator usage above that analyzed in the MND. Thus, plaintiffs argue that more generator usage may have environmental impacts on air quality, biological resources, energy, greenhouse emissions, and utilities and service systems.

Plaintiffs cite to record evidence from 2017 and 2018 related to a prior initial study, which the County deemed inadequate for failing to analyze impacts from generator usage, identifying concern over generator usage, as the area "would not be a priority for PG&E to restore power during winter

33

events." This evidence is irrelevant. It is based on a prior version of the project which proposed to use generators for backup power. As discussed above, the project as approved does not include such generator usage.

Plaintiffs cite to record evidence demonstrating that in 2018, the County's peer review consultant recommended Rolling Meadow obtain a letter from PG&E describing how PG&E planned to provide power to the site and obtain a letter from RCEA confirming it could provide the renewable energy source for the project. According to plaintiffs, no such letters were obtained.

Plaintiffs cite to area residents' comments about long lasting winter power outages. They questioned whether PG&E could supply year-round power in the rural area and explained that PG&E did not have enough power for current farm owners to obtain industrial power drops. One commenter stated PG&E was unable to meet the demand of recent cannabis farms because its infrastructure was not designed for that level of industry. Commenters suggested that during power outages the project would use generators for backup power, which could have fire safety and ecological impacts. While area residents may comment on their experiences with power outages and the inability to obtain power (see *Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.*, *supra*, 116 Cal.App.4th at p. 402), comments regarding the project's claimed generator usage and any alleged resulting impacts are speculative and inaccurate given the record and do not constitute substantial evidence (see *Parker Shattuck*, *supra*, 222 Cal.App.4th at p. 777).

Taking the evidence together, plaintiffs did not identify substantial evidence in the record of a fair argument that there may be a significant environmental effect. Even if we assume the record demonstrates that the

34

project may not be able to obtain power, it does not demonstrate that the project may have a substantial effect on the environment.  If Rolling Meadow cannot obtain power, the project will not operate.  Even if plaintiffs' assertions that PG&E will not be able to provide power to the project or that there may be long periods without power, the next step of their premise is unsupported.  Their arguments are all based on the premise that if there is no power to the project site, then generators will be used to power operations.  For the reasons explained above, this claim is speculative and contrary to the record.

Plaintiffs have not met their burden of demonstrating that substantial evidence supports a fair argument that the project's power demands may have a significant effect on the environment.

## 5. Fire Risk and Safety

Plaintiffs contend that the conclusions on fire risk and safety are unsupported by documentation, and that substantial evidence supports a fair argument that the fire risks associated with the project may have a significant effect on the environment.  We disagree.

The project site is accessed by two routes.  During the dry season, when the low water bridge over the Eel River is available, primary access is McCann Road via Dyerville Loop Road.  McCann Road is a county-maintained road between its connection with Dyerville Loop Road and the ranch's property line.  During winter, when the bridge is not available, access will be via Alderpoint Road.  The project will be attended by a maximum of 30 employees a day.  While Rolling Meadow initially proposed that employees would park on the ranch and then ride an electric bus to the cultivation locations, the project as approved will have the employees park at the park and ride lot near the highway and be picked up by a project bus.

35

As explained in the MND, the project is in a State Responsibility Area (SRA) and is designated by the Department of Forestry and Fire Protection (Cal Fire) as a very high fire hazard severity area. In the MND's checklist on wildfire impacts, the checklist asks, if located in a SRA or classified as a very high fire hazard severity zone, whether the project would substantially impair an adopted emergency response or evacuation plan, would exacerbate wildfire risks thereby exposing occupants to wildfire pollutants or the uncontrolled spread of a wildfire, would require the installation or maintenance of associated infrastructure, such as roads or emergency water sources, which may exacerbate fire risk or that may result in impacts to the environment, and would expose people or structures to significant risks resulting from runoff, post-fire slope instability, or drainage changes. The MND concluded these impacts were less than significant or nonexistent.

In assessing the impact of whether the project would exacerbate wildfire risks thereby exposing occupants to wildfire pollutants or the uncontrolled spread of a wildfire, the MND explained that the project had the potential to significantly exacerbate wildfire risk. It explained that because the project design included rainwater storage and emergency generators, and because it will improve internal roads to meet the SRA Regulations, the project would improve evacuation success, and the impact was reduced to less than significant.

In assessing the impact of whether the project would require the installation or maintenance of associated infrastructure, such as roads, emergency water sources, or power lines, which may exacerbate fire risk or result in impacts to the environment, the MND concluded the impact was less than significant. The MND explained the project would expand electric power into the project area with underground PG&E power lines. PG&E

36

would conduct a site-specific review of the project and create a construction plan. The project would comply with PG&E's site-specific safety and installation requirements and thereby it reduced the potential of the project to exacerbate fire risk and associated environmental impacts to less than significant. The MND concluded the associated fire risk from power line installation was less than significant.

In assessing hazards impacts, the MND concluded the project would not impair implementation of or physically interfere with an adopted emergency response plan or emergency evacuation plan. The MND explained that this is because of the isolated location. If there was a wildfire, the project would use the electric bus to evacuate the employees, so there was no potential for employee traffic to interfere with emergency evacuation. Regarding response time, the MND explained that Cal Fire provides emergency response to fire, and the nearest Cal Fire station is in Weott, 12 miles away. It stated it would take firefighters 35 minutes to reach the project site.

The MND relied on an access assessment of McCann Road prepared by Northpoint Consulting in 2020. The MND stated Northpoint Consulting concluded McCann Road meets the category 2 road standard and is the functional equivalent of a category 4 road[15] with implementation of recommendations the consultant made and due to extremely low traffic volumes. Record evidence demonstrates that the County's department of public works (Department of Public Works) also investigated the width of McCann Road and conducted multi-day traffic counts. The deputy director

---

[15] Per the SRA Regulations, for emergency access, roads must meet a minimum category 4 road standard, which requires two 10-foot-wide traffic lanes capable of providing for two-way traffic to support emergency vehicle and civilian egress. (County Code, § 3112-3.)

stated that while McCann Road was not developed to category 4 road standards, it was "developed to an adequate functional classification for the proposed project." The Department of Public Works reviewed Northpoint Consulting's access assessment and found its conclusions to be consistent with the Department's findings.

In approving the project, the conditions of approval include requirements that a minimum of 50 percent of the stored rainwater must be reserved for fire suppression purposes, that Rolling Meadow must store sufficient water at each structure for firefighting purposes, which amount "shall be approved" by the Planning Director in consultation with either Cal Fire or the Fruitland Ridge Fire District, and that Rolling Meadow must purchase a tanker truck to have onsite in the event of a fire.

### a. Unsupported Conclusions

Plaintiffs contend the County's conclusion that there were no potentially significant environmental impacts based on wildfire conditions is not supported by documentation, constituting a prejudicial abuse of discretion. Preliminarily, we observe, again, that plaintiffs cite no legal authority in this section of their opening brief (section V.D.2) or reply brief (section II.F.5). (See *Cinema West*, *supra*, 13 Cal.App.5th at p. 219.)

Plaintiffs assert there is "no documentation establishing that McCann Road can handle emergency wildland fire equipment and civilian evacuation (see *supra*, section V.D.1)." On this topic, that is the entirety of their claim related to emergency access and evacuation. Section V.D.1 of plaintiffs' opening brief addresses their contention that the project conflicts with the General Plan and SRA Regulations. It is not a CEQA argument. Because plaintiffs make no substantive argument demonstrating how this issue was a prejudicial abuse of discretion under CEQA and do not cite the record or legal

38

authority, we will not address their one-sentence argument.  (See *Los Angeles Unified*, *supra*, 57 Cal.App.5th at pp. 497–498; *Cinema West*, *supra*, 13 Cal.App.5th at p. 219; *Hernandez*, *supra*, 37 Cal.App.5th at p. 277.)

Plaintiffs also contend "there is a lack of substantiation regarding the ability of rainwater storage to address wildfire emergencies."  Plaintiffs point to the MND, which stated that the project will store up to 320,000 gallons of rainwater, which will be used for landscaping, fire protection, and supplemental water for dust mitigation and irrigation.  In concluding the project would have a less than significant impact on exacerbating wildfire risks, the MND pointed to rainwater storage as one reason the impact had been reduced to less than significant.  In approving the project, the County imposed a condition of approval that a "minimum of 50% of the stored water shall be reserved for fire suppression purposes.  The applicants shall install meters at all storage tanks and make the logs available to [C]ounty staff upon inspection."  Plaintiffs argue "there is no documentation supporting the conclusion that 50% of the stored water will be available during the entirety of the fire season or that 50% of the stored water would be sufficient to address a wildfire."

The County and Rolling Meadow argue plaintiffs forfeited this argument for failure to exhaust administrative remedies.  We disagree.  The issue was raised during the administrative process.  (See *Agoura*, *supra*, 46 Cal.App.5th at p. 677.)  For example, in remarking on wildfire risk, a member of the public commented that the "new water use plan put forth by the applicant at the last minute . . . shows that stored water of 320,000 gallons will be 'depleted in August and September.' . . . There is no additional proposed water storage and the new plan shows that stored water will be depleted in August, September and October—when it would be most needed

39

for fire season." The commenter requested the County "[r]equire that there will either be additional storage or that water for fire suppression is not depleted at any time." At the appeal hearing, counsel for the administrative appellants argued that various conditions of approval should be adopted, including that rainwater must be reserved for firefighting during fire season.

Plaintiffs fail to demonstrate how their contention that no documentation supports the conclusion regarding rainwater being used for fire suppression constitutes a prejudicial abuse of discretion. On this topic, plaintiffs spend one paragraph merely summarizing parts of the record. They do not cite legal authority or provide a substantive analysis to demonstrate how their argument—if accurate—constitutes a CEQA violation.

Finally, plaintiffs contend the County's conclusions regarding wildfire conditions "also relied on PG&E being able to run new electric lines underneath the existing road structure. As addressed *supra*, section V.C.1, there is no documentation supporting this." In section V.C.1 of their opening brief, plaintiffs argued that the findings regarding the project's power sources were conclusions unsupported by any documentation. We need not address this argument further.

*b. Fair Argument of Significant Effect on the Environment*

Plaintiffs argue substantial evidence in the record supports a fair argument that the fire risks associated with the project may have a significant effect on the environment. We disagree.

Plaintiffs focus on access issues and response times for emergency services. The County and Rolling Meadow argue plaintiffs forfeited their contention regarding emergency response times by not raising it before the trial court. In response, plaintiffs point to one sentence in their trial brief where they asserted that the MND downplayed "the site access challenges

40

that would be encountered by police, fire, and other emergency services." They also point to a brief remark at the trial court hearing where plaintiffs argued that the project posed a significant risk of environmental impact if there is a wildfire "and fire protection services, fire suppression services, cannot get there safely and timely." The trial brief, despite the sentence plaintiffs point to, did not make any arguments based on record evidence discussing long emergency response times to the project area. Plaintiffs forfeited any argument attempting to demonstrate a significant effect on the environment based on response times. (See *Ocean Street*, *supra*, 73 Cal.App.5th at pp. 1008–1009.) Even assuming plaintiffs did not forfeit this argument, they did not meet their burden of citing record evidence supporting a fair argument that the project may have a significant effect on the environment. Plaintiffs rely on the following evidence.

In 2017—before any MND was circulated for review—Cal Fire advised the County that "many hazards" confronted "fire protection agencies in most subdivisions on SRA lands. Steep terrain and heavy wildland fuels contribute to fire intensity and spread. The distances from fire stations and road grades encountered usually create an excessive response time for effective structure fire suppression purposes." Cal Fire advised that in SRA areas, it "does not support development in areas where there is no local agency fire service for structure fires and emergency medical response."

In January 2018, County staff wrote to Rolling Meadow after reviewing the 2017 initial study. Staff identified various deficiencies in that initial study, including on the topic of fire protection in the public services impact analysis. Staff expressed concerns regarding the response time to access the site during a fire, and stated that the initial study must respond to this potential impact resulting from high risk response times.

41

The Fruitland Ridge Volunteer Fire Protection District (district)—first responders for the project site—commented on the MND. The district explained that it took 22 minutes to reach the McCann bridge, with additional time added for any location, like the project, on the east side of the Eel River. The farthest location of the project is over five miles from the bridge. Depending on road conditions, it could take an emergency vehicle between 20 and 60 minutes to navigate the incident, for a total response time between 42 minutes to 1 hour, 22 minutes. The district also expressed concern about access, stating the roads to the area are category 2 roads made of gravel and dirt, with steep slopes and hairpin turns. The private roads across the river are narrow and dangerous for emergency vehicles.

Additionally, the district commented on the project's water storage in the event of a wildfire. It stated the approximately 300,000 gallons of stored water were inadequate, explaining that the turnaround time for a water tender was at least 45 minutes, and the water tender would use its 2,500 gallons of water in 20 minutes. The district recommended the project be required to store one million gallons of water.

The administrative appellants retained Steve Salzman, a licensed civil engineer, to conduct an evaluation of McCann Road. Salzman performed a survey of McCann Road from Dyerville Loop Road to the gate of Rolling Meadow's property. He determined whether the road meets the standards of a category 4 (or equivalent) road pursuant to the County "Standards for Roadway Categories."

Salzman observed the following road conditions from McCann Road's intersection with Dyerville Loop Road, across the river, and east to the property gate: The bridge over the river is 11 feet wide and if a vehicle broke down on the bridge access would be blocked. The segment of the road

heading east from the bridge is a 12-foot wide gravel causeway, next to about 800 feet of gravel bar.  Moving east, the road varies between 12 and 16 feet wide with no consistent shoulders and a number of pinch points where the road is too narrow for two vehicles to pass, some with adequate turnouts and others without.  The remainder of the road to the property gate is gravel or dirt with short segments of old asphalt, with widths that vary between 12 and 14 feet.  This area has no consistent shoulders and a number of pinch points where the road is too narrow for two vehicles to pass, some have turnouts to allow passing while others do not.  He described it as a one-lane dirt road.  Salzman concluded that none of the segments of McCann Road from the bridge to the property meet category 4 requirements.  He explained that the County's director of Public Works has the authority to declare the road a category 4 equivalent, based on evaluation of the road conditions and its uses.  He opined, though, that McCann Road does not meet the requirements for a category 4, or equivalent, road.

Plaintiffs also cite to public comments, claiming the public "commented about the increased fire risk posed by the Project, and based upon personal knowledge, they addressed drought conditions, road hazards, emergency response time, and more."  But plaintiffs merely provide a lengthy string of record cites "without making an attempt to explain what is contained in those pages or why it is relevant," which "is by itself sufficient to defeat their arguments." (*Rominger*, *supra*, 229 Cal.App.4th at p. 729.)

Plaintiffs' evidence does not support a fair argument that the project may have a significant effect on the environment related to wildfire risks. Plaintiffs focus on evidence regarding response times in the event of an emergency, but they do not explain how lengthy response times constitute an impact on *the environment* caused *by the project*.  (See § 21068 [" 'Significant

43

effect on the environment' means a substantial, or potentially substantial, adverse change in the environment."]; § 21060.5 [" 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, or objects of historic or aesthetic significance."].) Any difficulty for first responders to access the project site, and the surrounding area, exists without the project. Plaintiffs fail to explain how any issues related to access—emergency vehicle ingress and civilian egress—may impact the *environment*. "The question is not whether substantial evidence supports a fair argument that the proposed project will have significant impacts on resident safety and emergency evacuation. . . . [T]he question is whether the project may have a significant effect on the environment." (*Newtown Preservation Society v. County of El Dorado*, *supra*, 65 Cal.App.5th at p. 788, italics omitted.) Here, the *environment* affects access, not the project. (See *ibid*. [analysis does not extend to situations where the environment has an effect on a project]; see also *City of Hayward v. Trustees of California State University* (2015) 242 Cal.App.4th 833, 843 ["The need for additional fire protection services is not an environmental impact that CEQA requires a project proponent to mitigate." (italics omitted)].)

This shortcoming is further emphasized in plaintiffs' reply brief. In claiming to support their fair argument contention, plaintiffs contend that the "record demonstrates that the location of the Project is such that wildfire risks are exacerbated, and should a fire start, its uncontrolled spread is likely. This is so because the Project's location and roadways prevent quick access by emergency services." This claim does not satisfy plaintiffs' burden to demonstrate a fair argument of a significant effect on the environment.

Plaintiffs also assert, "Credible, substantial evidence exists that the Project is associated with an increased risk of wildfire, and the County has not properly mitigated for this impact. Specifically, the County's reliance on rainwater catchment tanks is not a sufficient mitigation measure to address the increased risk of wildfire associated with the Project." To the extent plaintiffs are arguing the project's use of rainwater catchment tanks may have a significant effect on the environment, they do not provide any substantive argument of how so. (See *Cinema West*, *supra*, 13 Cal.App.5th at p. 219; *Hernandez, supra*, 37 Cal.App.5th at p. 277.)

In sum, plaintiffs have not met their burden of demonstrating that substantial evidence supports a fair argument that the project may have a significant effect on the environment related to fire and safety risks.

## B. *Planning and Zoning Law*

In discussing fire risks and safety, plaintiffs argue the project conflicts with the General Plan and SRA Regulations.

### 1. Additional Background

As summarized above, based on Northpoint Consulting's access assessment and the Department of Public Works' evaluation, the County determined that McCann Road meets category 4 functional equivalency. At the Board hearing, the deputy director of the Department of Public Works explained that not all roads need to meet or exceed category 4 standards to have adequate functional capacity; if a road is less than category 4, it may be shown that it is functionally equivalent to meet Cal Fire requirements. Roads not constructed to category 4 standards must be analyzed by an engineer to ensure the road has adequate functional capacity which, here, was documented in the access assessment for the project. County staff explained that the concept of functional capacity stems from the SRA

45

Regulations and considers the volume of the road related to its capacity. A road with adequate functional capacity can accommodate the demands of the road and emergency response vehicles. Based on the access assessment and Department of Public Works' evaluation, the Planning Department determined McCann Road can accommodate the traffic associated with the project.

In approving the project, the County found the project was consistent with the General Plan. The County's consistency findings discussed fire risk, explaining that Cal Fire's comments had recommended compliance with the SRA Regulations, which establish development standards for minimizing wildfire danger in SRAs. The findings explained that Cal Fire had been sent referrals for the project. The County found the project to be consistent with the fire protection policies of the General Plan's Safety Element.

The County also found the project would be required to comply with all County regulations for fire risk, explaining that the "project is required to adhere to all Cal[ ]Fire regulations and standards regarding fire safety. County [Department of] Public Works states that McCann Road is developed to an adequate functional classification for the project." The County found the "project conforms to the General Plan policies related to access roads in areas of fire risk, including Safety Element . . . policies." It explained that Northpoint Consulting's access assessment "concluded that the project conforms to County Code Fire Safe Regulations with recommended improvements, which are incorporated into the project." A condition of approval requires Rolling Meadow to complete all recommended improvements to McCann Road as specified in the Northpoint Consulting report. Another condition of approval requires Rolling Meadow to submit a

46

transportation management plan detailing how employees will park at the park and ride lot off the highway and be picked up by a project bus.

## 2. Legal Principles & Standard of Review

The Planning and Zoning Law provides every county must adopt a "comprehensive, long-term general plan for the physical development of the county." (Gov. Code, § 65300.) A general plan is essentially the " 'constitution for all future developments' " within a city or county. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570.)

" '[A] governing body's conclusion that a particular project is consistent with the relevant general plan carries a strong presumption of regularity that can be overcome only by a showing of abuse of discretion.' [Citations.] 'An abuse of discretion is established only if the city council has not proceeded in a manner required by law, its decision is not supported by findings, or the findings are not supported by substantial evidence.' " (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816.) "A project need not conform perfectly to every general plan policy to be consistent with the general plan. [Citation.] The rule of general plan consistency is that the project 'must be "compatible with the objectives, policies, general land uses, and programs specified in" ' the general plan." (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 501 (*Golden Door*).) In determining whether a project conflicts with a general plan, " 'the nature of the policy and the nature of the inconsistency are critical factors to consider.' [Citation.] A project is inconsistent with a general plan 'if it conflicts with a general plan policy that is fundamental, mandatory, and clear.' " (*Spring Valley Lake Assn. v. City of Victorville* (2016) 248 Cal.App.4th 91, 100.)

" '[C]ourts accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that "the

body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes." ' " (*Golden Door, supra*, 50 Cal.App.5th at p. 501.)

"It is, emphatically, *not* the role of the courts to micromanage these development decisions. Our function is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence." (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719–720.) Courts may not substitute their view for the view of the county officials, nor reweigh conflicting evidence. (*Id.* at p. 717.) As stated by our Supreme Court, "Reviewing courts must defer to a procedurally proper consistency finding unless no reasonable person could have reached the same conclusion." (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 155.) The burden is on plaintiffs to demonstrate, based on the evidence in the record, that a general plan consistency determination was unreasonable. (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1563.)

A county's "interpretation of its own ordinance is ' "entitled to deference" in our independent review of the meaning or application of the law.' " (*Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 434.)

Turning to the General Plan, the Safety Element includes policies S-P19 and S-S9, both of which state that development "shall conform to" the

48

SRA Regulations.  Implementation measure S-IM5 states that the County "shall maintain efficient and timely procedures for processing SRA Exception Requests to CAL FIRE."

The SRA Regulations "constitute the basic wildland fire protection standards of the County for lands within" SRAs.  (County Code, § 3111-1.)  The SRA Regulations were adopted to establish "minimum wildlife protection standards in conjunction with building, construction and development in SRA."  (*Id.*, § 3111-2.)  They require that the "future design and construction of structures, subdivisions and developments in SRA shall provide for basic emergency access."  (*Ibid.*)

Chapter 2 of the SRA Regulations dictates emergency access, requiring that non-exempt roads provide "safe access for emergency wildland fire equipment and civilian evacuation concurrently."  (County Code, § 3112-1.)  For width, roads must meet a minimum category 4 road standard, which requires two 10-foot-wide traffic lanes capable of providing for two-way traffic to support emergency vehicle and civilian egress.  (*Id.*, § 3112-3.)  Roadways must support at least 75,000 pounds for a fire vehicle.  (*Id.*, § 3112-4.)

An exception to the requirement to meet a category 4 road standard may be granted.  (County Code, § 3112-3.)  The exception must provide "the same overall practical effect as these regulations towards providing defensible space."  (*Id.*, § 3111-8.)  The exception provisions of the SRA Regulations require an applicant to apply for an exception, which are dealt with by the local inspection authority together with Cal Fire.  (*Id.*, §§ 3111-7, 3111-9.)  When an exception to the access standards is requested, the County must request Cal Fire to review the exception request.  (*Id.*, § 3111-9.)  If Cal Fire does not respond within 30 days, the Planning Director shall assume Cal Fire supports the exception.  (*Ibid.*)

49

### 3. Analysis

Plaintiffs focus on emergency access via McCann Road and the General Plan's mandate to coordinate with Cal Fire.

As to access, plaintiffs contend the project does not conform to the SRA Regulations regarding road standards and, therefore, is inconsistent with the General Plan. General Plan policies S-P19 and S-S9 require that development "shall conform to" the SRA Regulations. The SRA Regulations, in turn, require roads to meet a minimum category 4 road standard—two 10-foot-wide lanes. (County Code, § 3112-3.) McCann Road does not meet a category 4 minimum width. However, the purpose of the category 4 width standard is to allow "for two-way traffic flow to support emergency vehicle and civilian egress." (*Ibid*.) The exception provisions authorizing a lower road category demonstrate that the goal is to protect the intent of the SRA Regulations without imposing undue hardship due to conditions peculiar to the County. (*Id*., § 3111-7.) An exception may be allowed where it "provides the same overall practical effect as" the SRA Regulations. (*Id*., § 3111-8.)

Substantial evidence in the record demonstrates that McCann Road allows for a traffic flow which supports emergency vehicle access and civilian evacuation and, thus, has the same overall practical effect that the SRA Regulations require. As already discussed, the Department of Public Works independently evaluated McCann Road and reviewed Northpoint Consulting's access assessment, and it concluded the road was "developed to an adequate functional classification for the proposed project." The County made findings on General Plan consistency and relied on this information. Plaintiffs argue that no reasonable person could conclude that McCann Road is functionally equivalent to a category 4 road. We disagree. Plaintiffs failed

50

to meet their burden of demonstrating that the project is inconsistent with the General Plan's requirements to conform with the SRA Regulations.

Plaintiffs also contend the County failed to properly coordinate with Cal Fire, in violation of General Plan policy S-P17 and implementation measure S-IM5, and in violation of SRA Regulations sections 3111-4, 3111-9, and 3112-3.[16] Implementation measure S-IM5 states the County "shall maintain efficient and timely procedures for processing SRA Exception Requests to CAL FIRE." The SRA Regulations' exception provisions require the County to ask Cal Fire to review an exception request. (County Code, § 3111-9.)

The County and Rolling Meadow claim the County did consult with Cal Fire. In 2017, Cal Fire submitted a comment letter on Rolling Meadow's permit applications. For projects in SRAs, Cal Fire submitted its recommendations for development, including that the development must meet minimum fire safe standards in conformance with the County regulations, including specific standards for roads providing ingress and egress. Cal Fire stated that if it developed any additional comments on the project, it would submit an additional response letter. There is no showing that Cal Fire commented further. Based on Cal Fire's letter, the County's staff report included a chart showing to which referral agencies the project had been referred to for review and comment, and it marked that Cal Fire had responded and provided conditional approval. The Board's resolution

---

[16] The County and Rolling Meadow argue plaintiffs are barred from raising arguments based on General Plan policy S-P17 and County Code, section 3111-4 because they were not raised during the administrative process. Plaintiffs concede that neither policy S-P17 nor section 3111-4 were raised during the administrative process so, therefore, we do not consider their arguments based on these authorities. (See *Agoura, supra,* 46 Cal.App.5th at p. 677.)

51

approving the project stated Cal Fire had been sent referrals for the project. The record demonstrates that the County sent Rolling Meadow's permit applications to Cal Fire and received a reply.

It is unclear whether the material provided to Cal Fire in 2017 included information about road standards or emergency access. But even if the County did not request Cal Fire to specifically review a determination that McCann Road is the functional equivalent of a category 4 road, plaintiffs fail to demonstrate how this constitutes an abuse of discretion. Substantial evidence summarized above demonstrates that the County considered the General Plan and SRA Regulations, evaluated McCann Road, and found it functionally equivalent to meet the SRA Regulations' access standards. Plaintiffs have not explained how noncompliance with the requirement to have Cal Fire review a road standard exception request mandates that we find an abuse of discretion. (See *Golden Door*, *supra*, 50 Cal.App.5th at p. 501 [a project need not conform perfectly to every general plan policy].)

In sum, plaintiffs have not met their burden of showing an abuse of discretion.

## III.   DISPOSITION

The judgment is affirmed. The County and Rolling Meadow are awarded their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

LANGHORNE WILSON, J.

WE CONCUR:


BANKE, ACTING P. J.


SIGGINS, J.[*]


A167278
*Northcoast Environmental Center v. County of Humboldt*

---

[*] Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

53